IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VICTOR S. NAZARIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RUSSELL SINCLAIR, | ) |
| | ) |
| Defendant. | ) |

NOTICE OF REMOVAL OF CIVIL
ACTION TO UNITED STATES DISTRICT COURT

# EXHIBIT A

# Complaint



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Victor Nazarian, 1015 Crawford Drive
Rockville, MD 20851
_____ Plaintiff

vs.

Case Number 14 - 0005577

Russell Sinclair 4 Russian Drive
Stafford, VA 22556
_____ Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Victor Nazarian Pro Se
Name of Plaintiff's Attorney

1015 Crawford Drive
Address
Rockville MD 20851

301-461-4732
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date 07/09/2014

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Dé có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요     ያማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                                           CASUM.doc



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

VICTOR S. NAZARIAN
Vs.
RUSSELL SINCLAIR

C.A. No.    2014 CA 005577 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge CRAIG ISCOE
Date: September 4, 2014
Initial Conference: 9:30 am, Friday, December 12, 2014
Location: Courtroom 200
500 Indiana Avenue N.W.
WASHINGTON, DC 20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

VICTOR S. NAZARIAN )
1015 Crawford Drive )
Rockville, MD 20851 )
)                        14-0006577
    Plaintiff, )
) Case No.
v. )
)
Russell Sinclair )
4 Ruffian Drive )
Stafford, VA 22556 ) JURY TRIAL DEMANDED
)
    Defendant. )
)
)
)
)
)
)
)

## COMPLAINT

Plaintiff, Victor S. Nazarian, for his complaint against Defendant Russell Sinclair, alleges as follows:

### INTRODUCTION

1. This is a defamation action brought by Victor S. Nazarian against Russell T. Sinclair for his utterly false and defamatory statements against Mr. Nazarian—accusing him of absence of integrity, improper and unauthorized activities, labeling him as false, and denigrating his work and behavior in writing and verbally.

2. Mr. Nazarian is an aerospace engineer, technology expert and project manager with more than 30 years of experience who also serves part time as direct augmentation to the active duty Coast Guard as auxiliary personnel. Mr. Nazarian has worked as a contract engineer and project manager for various organizations within the Federal Aviation Administration since 2008. Mr. Nazarian has earned the respect of his peers and the ongoing trust of many in the aviation community and the Coast Guard community.

3. Without regard to factual circumstances and with malicious intent, the defendant Mr. Sinclair asserted, in writing and verbally, to various personnel of Triumph Enterprises, Inc (hereinafter "Triumph"), to persons within the business community and to personnel associated with the client Federal Aviation Administration (hereinafter "FAA" or "client") that Mr. Nazarian conducted himself improperly or falsely in activities and statements while working for the FAA as a contractor through Triumph, and that Mr. Nazarian showed an absence of integrity in his general conduct.

4. No evidence supporting Mr. Sinclair's assertions has been discovered. Investigations into Mr. Sinclair's statements have found no basis in fact to support his statements.

5. The defendant's assertions against the plaintiff are false, malicious, and defamatory per se. They are so outrageous as to amount to the intentional infliction of emotional distress. They are so professionally damaging as to cause lasting financial harm. Mr. Nazarian seeks judgment against the defendant as set forth in the claims below and the award of compensatory and punitive damages against the defendant.

## PARTIES

6. Mr. Nazarian is a professional engineer, technology expert and project manager currently working for the Department of Defense Suicide Prevention Office under contract through Goldbelt Glacier Health Services, Inc.

7. Defendant Russell T. Sinclair, upon information and belief, is a business manager working for Triumph Enterprises, Inc. in Maryland, Virginia and the District of Columbia having his principle residence at 4 Ruffian Drive, Stafford, Virginia 22556. Accordingly, Mr. Sinclair was and is transacting and doing business, including his activities described herein, within the District of Columbia and subject to the jurisdiction of this Court pursuant to DC Code ~13-422 and 13-423(a).

8. Venue in this Court is proper as the District of Columbia has personal jurisdiction over the defendant.

## STATEMENT OF FACTS

### Mr. Nazarian and his work for the Federal Aviation Administration and the U. S. Coast Guard

9. Mr. Nazarian received his undergraduate degree in Aerospace Engineering from Syracuse University and a Master of Science degree in Technology Management – Project Management track from University of Maryland University College. Mr. Nazarian's work in technical management and aviation spans three decades and he has worked under contract as an engineer, project manager, and technical consultant at the FAA since 2008.

10. Mr. Nazarian has a longstanding collegial and trusting business relationship with many contract personnel and FAA clientele including his time working for several organizations including Northrop Grumman, TASC, SRA International and Triumph Enterprises.

11. In addition to his other professional activities Mr. Nazarian is an operational Coast Guard Auxiliary personnel. Mr. Nazarian joined the U. S. Coast Guard Auxiliary in 2006 certifying soon thereafter as Aircrew flying patrols under Coast Guard orders. Mr. Nazarian also certified as direct augmentation to the active duty Boat Crew and Communications Watchstander under active duty command at Coast Guard Station Annapolis, Coast Guard Station St. Inigoes and for recruiting for the U. S. Coast Guard Academy.

12. Mr. Nazarian has served with distinction having twice received the Meritorious Team Commendation and a Special Operations Ribbon in addition to other awards and decorations. Out of over 25,000 auxiliary personnel, Mr. Nazarian is one of only 426 auxiliary personnel certified for auxiliary flight operations and one of only 167 auxiliary personnel certified for duty on active duty vessels and missions.

13. Mr. Nazarian is well regarded for his exceptionally good work as an operational aviation expert with a highly respected understanding of aircraft operations including both airborne and ground-based technology. He is also experienced with airborne surveillance and photography and intimately familiar with airport configurations and equipment emplacement.

14. While working for Triumph on a contract servicing tasks for the FAA client, Mr. Nazarian was assigned to work from several locations as appropriate to client needs and instructions.

Upon starting work for Triumph on 20 September of 2012, Mr. Nazarian's immediate superior, Triumph team lead Tim Sweeney, and FAA manager Dick Powel assigned Mr. Nazarian to work part time in the FAA's offices in the District of Columbia and part time in the Triumph Crystal City office at 201 12th Street as-needed by the client. On 20 January 2013 this arrangement was reaffirmed by Mr. Sweeney and FAA Manager Dan Gerecht. Mr. Sinclair was party to all such discussions and was made aware of all of the associated circumstances.

15.   In late February of 2013, also as approved or understood by all appropriate personnel including Mr. Powell, Mr. Sweeney, and FAA supervisor Bill Maynard, Mr. Nazarian was assigned to work part time at an assigned workspace and computer in the FAA Silver Spring offices on East West Highway, part time in the Triumph Crystal City office, and part time in the FAA offices in the District of Columbia as needed by the client.

16.   In May of 2013 the work location parameters for Mr. Nazarian were modified again by the FAA client and approved by Triumph such that he cease working from the Triumph Crystal City offices entirely but continue to work at his assigned workspace in the FAA Silver Spring offices and the FAA Eye Street offices in the District of Columbia as needed by the client. At no time did Mr. Nazarian assign himself a workspace or improperly claim or use any space, materials, or equipment without approval from the appropriate authorities.

## Mr. Sinclair's Expression of Animus and His Manufacture and Circulation of the 6 September Document

17.   On 22 August, without prior indication and for reasons unknown, Mr. Sinclair instructed Mr. Nazarian via eMail to cease all activities at the FAA's Silver Spring offices and cease any work associated with FAA client personnel at the Silver Spring offices. In addition, Mr. Sinclair instructed Mr. Nazarian to work exclusively from the FAA Eye Street office supporting only FAA personnel at Eye Street. Mr. Nazarian complied with those instructions. Mr. Nazarian properly and professionally informed all appropriate personnel as to his instructions from Mr. Sinclair, and vacated the Silver Spring, Maryland FAA offices. The following day, 23 August 2013, Mr. Nazarian started working exclusively from the FAA Eye Street offices as instructed.

18.  On 22 August and again on 23 August several FAA personnel including the on-site FAA supervisor Bill Maynard in Silver Spring and FAA manager Dick Powel at the FAA Eye Street offices contacted Mr. Nazarian and informed him that no prior consultation by Mr. Sinclair on the cessation of work in Silver Spring had been conducted. They further stated that Mr. Nazarian's work in Silver Spring was considered vital, time critical, and high profile and that his working at the Silver Spring office continued to be specifically necessary. Mr. Nazarian was told that Mr. Sinclair's instructions to cease work and change work locations had not been authorized by any FAA personnel and that Mr. Sinclair would be told to rescind his instructions to Mr. Nazarian.

19.  On 23 August Mr. Sinclair contacted Mr. Nazarian at the FAA Eye Street offices via telephone and entered into a verbal tirade laced with profanities, threats of termination, threats of pay reduction, and personal insults against Mr. Nazarian. These included threats or insults against Mr. Nazarian's person, Mr. Nazarian's business conduct, and Mr. Nazarian's service supporting the Coast Guard. Mr. Sinclair made it clear that he regarded the FAA client's instructions to reverse himself to be the direct result of improper actions on the part of Mr. Nazarian. Mr. Sinclair further stated that he would hold Mr. Nazarian accountable, would take action against Mr. Nazarian, and "get" him later.

20.  On 6 September Mr. Sinclair called Mr. Nazarian into a private meeting in the FAA Eye Street offices in the District of Columbia where he gave Mr. Nazarian a "Written Warning Letter" document printed on Triumph Enterprises, Inc. letterhead and addressed to several parties including Triumph Vice President Peter Armatis and Triumph Human Resources. Mr. Sinclair insisted that Mr. Nazarian sign the document.

21.  Mr. Nazarian told Mr. Sinclair that he considered the document false and refused to sign it without counsel present. Mr. Sinclair took that particular copy of the document back and the meeting ended without further discussion.

22.  Mr. Nazarian contacted the Triumph Director of Human Resources Stephanie Winebarger and asked about the document Mr. Sinclair had manufactured. Ms. Winebarger admitted that she and other Triumph personnel had received, read, and discussed the document. After some delay, Ms. Winebarger provided a copy to Mr. Nazarian, via eMail (EXHIBIT A and EXHIBIT B).

### Mr. Nazarian's Discussions with Triumph Management Regarding Mr. Sinclair's Manufacture and Circulation of the 6 September Document

23. In a series of meetings with Triumph Vice President Peter Armatis and Triumph Director of Human Resources Stephanie Winebarger it was made clear to Mr. Nazarian that they did not approve of the situation. Mr. Armatis and Ms. Winebarger made it clear to Mr. Nazarian that they did not wish the FAA client personnel to be made further aware of Mr. Sinclair's actions. They insisted that Mr. Nazarian not discuss Mr. Sinclair's assertions openly with anyone even though they admitted to being aware that Mr. Sinclair had already discussed his assertions and other statements with several other people.

24. During the remainder of 2013 it was conveyed to Mr. Nazarian by several Triumph and FAA personnel that Mr. Sinclair had continued to use derogatory comments and defamatory statements to describe Mr. Nazarian. Statements expressed to Mr. Nazarian by Triumph analyst Anne Bishop and others included Mr. Sinclair insisting at a Triumph social event that Mr. Nazarian had, "thrown a temper tantrum," and, "lied to the client so he could keep working at Silver Springs. [sic]"

25. In additional instances of defamation, on 16 December Ms. Bishop informed Mr. Nazarian that Mr. Sinclair had stated to her that same morning, "He's just playing Coast Guard," and "He's not under orders." These statements were made by Mr. Sinclair in apparent reference to Mr. Nazarian's official assignment to duty supporting the Coast Guard.

26. On 20 December Ms. Winebarger informed Mr. Nazarian that his employment with Triumph was being terminated, effective immediately. Soon thereafter Mr. Nazarian discovered that a Triumph employee, Scot Olsen, had taken possession some of Mr. Nazarian's property. Over the telephone, Mr. Olsen revealed that he had also heard defamatory statements when he told Mr. Nazarian he was keeping the property to ensure his cooperation, "in case you throw another tantrum like you did in Silver Spring."

### The Defamatory Statements in the 6 September 2013 Document

27. The statements circulated by Mr. Sinclair include several falsehoods that Mr. Sinclair states as fact. This represents the paramount substance of this suit.

28. On 6 September in the District of Columbia, Mr. Sinclair presented a document to Mr. Nazarian which he also circulated to several people including Mr. Armatis, Ms. Winebarger, and others. This document included the statement, "you insinuated yourself into the Silver Springs [sic] location, and obtained a desk there, working the obstacles."

29. This statement by Mr. Sinclair, is false and harmful, especially as circulated to Triumph personnel and discussed in exchanges Mr. Sinclair had with others. The false nature of Mr. Sinclair's statements has been attested to by former Triumph manager Tim Sweeney, FAA Supervisor Bill Maynard, and FAA Manager Dick Powell who were in authority and arranged for the work to be conducted by Mr. Nazarian at the Silver Spring office in the exact space where Mr. Nazarian was working. This particular false statement is made twice in the same 6 September document.

30. The 6 September document also included the statement by Mr. Sinclair charging that Mr. Nazarian, "made statements to the Client that [sic] were either not true, or misrepresented the truth, to get the Client to allow for you to stay and work this low-level analyst task of obstacles."

31. This statement by Mr. Sinclair, is false and harmful, especially as circulated to Triumph personnel and discussed in exchanges Mr. Sinclair had with others. No untrue or misrepresentative statements were made by Mr. Nazarian with regard to his FAA work at any time. This has been affirmed by former Triumph manager Tim Sweeney, FAA Supervisor Bill Maynard, FAA Manager Dick Powell, and others.

32. The 6 September document also included the accusation by Mr. Sinclair stating that, "you making a space for yourself at the 800 Independence Ave location was a Client Focused idea, in effect it caused further issues…"

33. This statement by Mr. Sinclair, is false and harmful, especially as circulated to Triumph personnel and discussed in exchanges Mr. Sinclair had with others. Mr. Nazarian was specifically assigned workspace on a part time, as needed, basis at the FAA 800 Independence Avenue

location. At no time did he make space for himself nor claim nor use any equipment that had not been authorized for his use. This has been affirmed by former Triumph manager Tim Sweeney, FAA Supervisor Greg Pray, FAA Manager Dan Gerecht, FAA Manager Dick Powell, and others.

34. The 6 September document also included the accusation by Mr. Sinclair of, "Over the past 12 months, it has become apparent that certain statements that you have made to the Triumph Leadership and your FAA Client regarding this "service" are inaccurate." Mr. Sinclair further states in the same paragraph, "you have been making statements regarding "Service" for the Auxiliary which are not factual or have a tendency to lean towards defining it as something other than the volunteer organization that it is."

35. Mr. Sinclair's stated purpose in making this false statement is to charge Mr. Nazarian with "Absence of Integrity." This statement is false and harmful, especially as circulated to Triumph personnel and discussed in exchanges Mr. Sinclair had with others.

36. Mr. Sinclair has provided no examples of any such statements by Mr. Nazarian to "Triumph Leadership and your FAA Client" that are inaccurate, non factual, or "lean" nor have any witnesses been discovered who will corroborate Mr. Sinclair's accusations. Further, Mr. Sinclair's ongoing, repeated denigrating comments regarding Mr. Nazarian's service supporting the U. S. Coast Guard caused additional harm.

37. The 6 September document also included the accusation by Mr. Sinclair of, "You have been reported, by your Client and co-workers in and out of Triumph, attending meetings and being in the workspaces in Tennis shoes and less than professional attire."

38. Mr. Sinclair's stated purpose in making this false statement is to charge Mr. Nazarian with "Absence of Integrity." This statement is false and harmful, especially as circulated to Triumph personnel and discussed in exchanges Mr. Sinclair had with others.

39. Mr. Sinclair has provided no examples of any such reports regarding attire by "Client and co-workers" nor have any witnesses been discovered who will corroborate Mr. Sinclair's accusations. No communications or counseling from Mr. Sinclair to Mr. Nazarian on this issue took place at any time during his employment except the malicious 6 September document. Mr. Nazarian never attended meetings nor conducted official business in anything but acceptable, professional attire.

### Mr. Sinclair's Refusal to Apologize or Retract Defamatory Statements

40. After Mr. Sinclair circulated the 6 September document Mr. Nazarian entered into a series of discussions with Triumph managerial personnel asking that they intercede and correct Mr. Sinclair's defamatory and hostile actions due to their authority over him as an employee. Triumph Vice President Peter Armatis and Triumph Director of Human Resources Stephanie Winebarger said that Mr. Sinclair refused to retract or apologize for his statements and actions. Mr. Armatis and Ms. Winebarger attempted to arrange for a minor change in the reporting and management chain between Mr. Sinclair and Mr. Nazarian but this proved ineffectual and Mr. Sinclair continued to further defame Mr. Nazarian on several occasions to multiple persons.

### COUNT I

#### (Libel per se against the defendant)

41. Each of the preceding paragraphs 1 through 40 herby incorporated herein by reference.

42. The aforementioned written statements by the defendant accusing Mr. Nazarian of various deeds are defamatory per se and tend to injure Mr. Nazarian in his profession because they falsely impute to Mr. Nazarian professional misconduct, corruption, fraud, and deceit as well as the commission of criminal offense, in a manner injurious to the reputation and esteem of Mr. Nazarian professionally throughout both government and business communities.

43. By circulating the aforementioned statements, the defendant knew they would be read and further distributed by members of the government and business communities. The statements were in fact circulated to and understood by such people as a direct, natural, probable, and foreseeable consequence of their distribution.

44. The aforementioned statements are false, and were false when made. The defendant knew or should have known the statements were false when made.

45. The aforementioned statements were presented by the defendant as fact or truth and were not presented as a matter of opinion. The defendant knew or should have known that the

statements would be understood as statements of fact or truth by members of the government and business communities as a direct, natural, probable, and foreseeable consequence.

46. The aforementioned false and defamatory statements were made by the defendant with actual malice, wrongful and willful intent to injure Mr. Nazarian. The statements were made in reckless disregard for the truth or falsity of the statements or with knowledge of their falsity. The statements were made with wanton and willful disregard of the reputation and rights of Mr. Nazarian.

47. The aforementioned statements were made of and concerning Mr. Nazarian, and were so understood by those who received them. The aforementioned statements were circulated to several individuals who have attested to receiving them. The Defendant knew or should have known that the statements were injurious to Mr. Nazarian's business activities and reputation.

48. As a result of the actions of the defendant, the character and reputation of Mr. Nazarian were harmed, his standing and reputation in the government and business communities was impaired, he suffered financially, and he suffered mental anguish and personal humiliation. Mr. Sinclair's actions negatively impacted Mr. Nazarian's future employment, and caused Mr. Nazarian to give up seeking work related to his FAA vocation and seek employment in another industry entirely.

49. As direct and proximate result of the actions of the defendant, Mr. Nazarian has been materially and substantially damaged financially, in his professional standing, and his personal private affairs. In making the defamatory statements, the defendant acted intentionally, maliciously, willfully and with the intent to injure Mr. Nazarian or benefit the defendant. The defendant is liable to Mr. Nazarian for punitive damages in an amount in accordance with proof at trial.

50. As a proximate result of the aforementioned statements and their circulation to others, Mr. Nazarian has suffered and continues to suffer damages in an amount to be determined at trial but not less than the jurisdictional minimum of this Court. The full nature, extent and amount of these damages is currently unknown, but this complaint will be amended at trial to insert said information if deemed necessary by the Court.

51. WHEREFORE, Plaintiff Victor Nazarian demands judgment against Russell Sinclair for: (1) compensatory damages in an amount to be proven at trial; (2) punitive damages in an amount to be proven at trial; (3) all costs, interest, attorneys' fees, and disbursement to the highest extent permitted by law; and (4) such other and further relief as this Court may deem just and proper.

DATED: September 4, 2014                             Respectfully submitted,

VICTOR NAZARIAN
1015 Crawford Drive
Rockville, MD 20851
Tel: (301) 461-4732
VicNaz1@aol.com

EXHIBIT A
Written Warning Letter by Russ Sinclair, 6 September 2013

# TRIUMPH

| | |
|---|---|
| Date | September 6, 2013 |
| To: | Victor Nazarian |
| From: | Russell T Sinclair, Triumph CSTL, FAA SOMASS |
| CC: | Peter Armatis, Triumph VP Civil Sector |
| | Human Resources, Triumph |
| Subject: | Written Warning Letter |

In accordance with Triumph's Code of Business Conduct and Ethics and Progressive Discipline policies, this memorandum is notification that you are being issued a written warning for performance issues and concerns.

Over the past 4 months, Victor, there has been a pattern of activity and actions that you have taken, that are not in compliance or conformance with the Triumph Core Values. This is a Written Warning Letter to address these shortcomings, in the hopes that a lasting and beneficial corrective action can take place.

**Absence of Integrity:**
-You have been reported, by your Client and co-workers in and out of Triumph, attending meetings and being in the workspaces in Tennis shoes and less than professional attire. Many of our CSTMs commute in comfortable shoes and attire; then change prior to entering the workspace. Please be aware that a professional appearance in the workspace, despite the attire of our Client, is a Triumph requirement.

-When you first arrived with Triumph, you discussed your involvement with the "Coast Guard Auxiliary". Over the past 12 months, it has become apparent that certain statements that you have made to the Triumph Leadership and your FAA Client regarding this "service" are inaccurate. It has also been brought to our attention by the Client that you have been making statements regarding "Service" for the Auxiliary which are not factual or have a tendency to lean towards defining it as something other than the volunteer organization that it is.

**Losing Focus on the Client:** There have been numerous events surrounding this shortfall since you have come aboard. Many of them small as an isolated event, but the accumulation of a chain of events all related to our Core Value of Client Focus are cause for great concern.

-Shortly after coming aboard in the last week of September, 2012, you entered into a heated discussion with one of our Clients, Adrienne Funk. I was present during that discussion, and despite the fact that you were incorrect, the mere issue of "arguing" with a Client, particularly within the first 30 days of starting a new and tumultuous contract, are not in keeping with our standard of Client Focus. As a result, that particular Client will not provide an engineering requirement to the team unless you are NOT going to be involved in it.

-You were assigned a space at the Triumph Crystal City Location upon assignment. While on the surface, it may appear that you making a space for yourself at the 800 Independence Ave location was a Client Focused idea, in effect it caused further issues with the same Client mentioned above, and for the COR in dealing with those discussions. Furthermore, you have been informed about the issues and regulations regarding Client Site and Triumph Site provisions and chose not to heed them.

-Shortly after starting the Obstacle work, despite the issues detailed above, you insinuated yourself into the Silver Springs location, and obtained a desk there, working the obstacles. You were hired as an engineer, and instead of working with the Client to identify additional engineering practices, studies, or other activities you could support, you maintained your focus on the obstacle work which was a low tier requirement for the team.

- Upon notification that your Engineering acumen was required, and to do a turnover with the Client and the other 2 CSTMs working obstacles, you made a scene at the Silver Springs Office and made statements to the Client

Triumph Business Sensitive Information




that were either not true, or misrepresented the truth, to get the Client to allow for you to stay and work this low-level analyst task of obstacles. The Client, in turn, reached out to Triumph and asked, "Why is all of my contract support for Silver Springs been pulled out?" The result of this query could only have come from your direct interaction with the Client, not in a focused and teamwork manner of a graceful transition of duties to the other two CSTMs, but rather a story of "I have been directed not to provide you support.", and "I am being directed to report to I Street." Instead of the good news story that you would be available to assist in the transition of duties, and that your engineering acumen was required elsewhere.

### Lack of Imaginative Approaches to Task Execution and Provision to the Enterprise

-Shortly after starting the Obstacle work, despite the issues detailed above, you insinuated yourself into the Silver Springs location, and obtained a desk there, working the obstacles. You were hired as an engineer, and instead of working with the Client to identify additional engineering practices, studies, or other activities you could you support, you maintained your focus on the obstacle work which was a low tier requirement for the team.

Victor, you have consistently been the source of more management due to your inability to maintain our Core Values, than the good form the execution on this contract. We, as a team, need to do something long lasting, and productive to turn this behavior around, and quickly.

Based on the discussions above, you are being placed on a Performance Improvement Plan (PIP) for the next 90 days.

Your PIP shall include the following requirements:

- Any discussions with your Client regarding PTO or LWOP for the purpose of your Coast Guard Auxiliary volunteering, shall NOT include the discussion or causal effect for your service in the Coast Guard Auxiliary. You will merely state that you are going to request PTO or LWOP for personal time off;
- You will carry your professional attire with you and make sure that prior to entering the workspaces, you are in that attire, and not in anything less than that which is prescribed in the Triumph Handbook;
- You will provide a plan for your execution of duties on the obstacles to your CSTL at 0930 EST on Friday, 6 September, 2013. The plan will begin as you place the requirements and milestones in the Program Management Plan on iTriumph, and be briefed in a Power Point slide show of no more than 4 slides at the 0930 meeting that same day; and,
- You will provide an up to date brief on the analysis that you are conducting for the contract similar to the Obstacle briefing. Start with the Program Management Plan on iTriumph, and then work a less than 4 slide brief into the 0930 discussion on Friday, 6 Sep 2013.

We will meet every 30 days during this 90 day PIP in order to provide guidance, information, and maintain the status of your performance. This assessment of continuing your employment, in accordance with Triumph's progressive discipline policy and procedure, may result in further disciplinary action up to and including termination. Although established for a 90 day period, this PIP in no way guarantees employment for any period of time. If immediate improvements are not seen, there may be immediate disciplinary action taken, up to and including termination.

EXHIBIT B
Electronic mail from Stephanie Winebarger of Triumph Enterprises demonstrating her possession of Exhibit A and forwarding a copy of said document to Mr. Nazarian.

From: Stephanie Winebarger
Sent: Tuesday, October 01, 2013 16:39
To: Victor Nazarian
Subject: Document

Hi, Victor. I hope you had a great weekend. As we discussed on Friday, attached is the document Russ reviewed with you.

If you have any questions, or would like to discuss further, please let me know.

Thanks,
Stephanie

[Description: Description: triumph logo (email)]<http://www.triumph-enterprises.com/>
Client Focus • Integrity • Imagination

Stephanie R. Winebarger, SPHR
Director of Human Resources

11325 Random Hills Road Suite 340
Fairfax, Virginia 22030
Direct: 703.563.3985
Cell:    703.577.2971
Fax:    888.950.5604
Stephanie.Winebarger@triumph-enterprises.com<mailto:Stephanie.Winebarger@triumph-enterprises.com>